**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| BEMONT INVESTMENTS, LLC., by and through its Tax Matters Partner, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 4:07cv9 (Consolidated with 4:07cv10) |
| UNITED STATES OF AMERICA, | § § | |
| Defendant. | § | |

**FINDING OF FACTS, CONCLUSIONS OF LAW,
MEMORANDUM OPINION AND ORDER**

This is an action under 26 U.S.C. § 6626 for readjustment of the partnership items arising out of two U.S. Return of Partnership Income forms (Forms 1065) filed by BM Investments LC (Bemont) for the tax period ending December 19, 2001, and BPB Investments (BPB) for the tax period ending December 31, 2002. The case was tried before the Court for four days from March 22, 2010 until March 25, 2010. Numerous exhibits and extensive testimony, both live and by deposition, were received. Thereafter, the Court conducted several additional evidentiary hearings and considered post-trial briefing submitted by the parties.

For the reasons set forth below, the Court concludes that the partnership item adjustments made by the IRS are correct. The Court also makes certain factual determinations relevant to the assessment of accuracy-based penalties. The Court is without jurisdiction to address the assessment

of specific tax penalties in this proceeding. The Court further finds that the three-year statute of limitations has run as to Bemont's 2001 return.

Much of Plaintiffs' arguments concerning the propriety of the tax shelter focuses on their argument that the long and short swaps at issue were entered to facilitate a proposed tender offer for an Australian company, Solution 6. Although, at some point in time, Andrew Beal and Tom Montgomery focused on a possible tender offer, the structuring of the swaps to claim considerable losses was the primary objective of the parties. The following findings support the Court's conclusion that the transaction, as structured, lacked economic substance.

1. Tom Montgomery is a CPA and former managing partner of Montgomery, Baggett, Drews, LLP.

2. Andrew Beal is the sole shareholder of Beal Financial Corporation.

3. In 1999, Montgomery's CPA firm sold all of its assets to Solution 6 Holding Ltd, an Australian software and sales firm.

4. Prior to the sale to Solution 6, Montgomery had an extensive relationship with Solution 6.

5. Both prior to the sale and after the sale, Montgomery remained a key advisor to Solution 6.

6. On the sale of the accounting firm to Solution 6, Montgomery became chief financial officer of Solution 6.

7. In June 2000, Montgomery became a board member of Solution 6.

8.  In 2000, Montgomery moved to Australia to work at Solution 6, only to be terminated shortly thereafter.

9.  In the Spring of 2001, Montgomery believed that the Solution 6 stock would significantly increase over the next few years. During this time, the stock price was around $1.40 per share, down from the price per share when Montgomery left Solution 6.

10. In the Spring of 2001, Montgomery believed that Solution 6 was undervalued and, with the management team in place, would appreciate in value.

11. Montgomery started working with Andy Beal in the Spring of 2001.

12. Montgomery became the head of BFC Capital, Inc. The business objective of BFC was to explore new investment opportunities for Beal and his banks.

13. Montgomery recommended that BFC invest in Solution 6.

14. Plaintiffs' Exhibit 2000 reflects that the Board of Directors of BFC approved the acquisition of $4 million worth of Solution 6 stock.

15. The initial approval for the acquisition for Solution 6 stock was in May 2001.

16. Initially, there were no discussions concerning a takeover of Solution 6, rather merely investing in the company's stock.

17. BFC began acquiring stock in May 2001.

18. Between May and September 2001, BFC acquired 7.6 million shares of Solution 6 stock.

19.     The shares were normally acquired over this period through buying small lots.

20.     By the end of August 2001, BFC owned 4.5% of Solution 6 stock.

21.     If BFC owned more than 5% of the company, it would be required to disclose its intentions as to the purchases.

22.     One of Beal's affiliates employed Jeff Crawford to prepare a business proposal for acquiring Solution 6. Crawford spent several hundred hours in preparing a proposal over a six-month period.

23.     BFC received an inquiry from the Australian Securities Exchange as to its purchases and hired an Australian law firm, Swaab, to respond to the inquiry.

24.     During the summer of 2001, a former officer for Solution 6, Chris Tyler, also discussed the possibility of a takeover of Solution 6 with BFC.

25.     In early August 2001, Montgomery had his agents in Australia approach Solution 6's largest shareholder, Telstra, about their willingness to sell shares. Montgomery acknowledged that, without Telstra on board, a takeover in all likelihood would not succeed.

26.     After adverse publicity concerning the potential takeover surfaced, BFC decided not to pursue the takeover with any assistance from Chris Tyler.

27.     Montgomery testified that any tender for Solution 6 would have to be in Australian dollars.

28.     Montgomery testified that the first time there were any discussions on hedging

American dollars to account for any currency risk issues associated with a potential takeover was in late August or early September.

29. Montgomery finally settled on using long and short swaps to hedge the currency risk.

30. These swaps were brokered by Deutsche Bank.

31. According to Montgomery, the intent in using the swaps was to hedge additional capital that might be needed to fund the takeover.

32. Montgomery testified that approximately $175 million would come from Beal's resources and the additional $10 million would be funded through the swaps.

33. Montgomery was also aware that using swaps could have potential tax benefits.

34. Montgomery testified that certain entities were set up to pursue the possible tender offer. BPB Investments was capitalized with $4 million of Solution 6 stock and $5 million cash. This was done around September 13, 2001.

35. To facilitate the transaction, BFC paid a dividend of 7,678,467 shares of Solution 6 stock to Beal. Beal then contributed the stock to BPB. All of this occurred one day prior to the purchase of the swaps.

36. On September 14, 2001, BPB entered into four digital foreign currency swaps with Deutsche Bank involving payments pegged to US dollars and Australian dollars.

37. Two of the swaps were "long swaps" which called for BPB to pay Deutsche a yield adjustment fee of $101,250,000 for each long swap or $ 202,500,000 in total. The second two swaps are "short swaps" which called for Deutsche to pay BPB a yield

adjustment fee of $98,750,000, or a total of $197,500,000 for both.

38.     The swaps were also structured so that the parties would make certain offsetting fixed payments to each other, resulting in net payments when all was said and done to BPB of $2,500,000 based on the original exchange rate. The net effect of all this was an eventual $2,500,000 cash outlay by BPB to Deutsche for these swaps.

39.     The only cash exchanged was the initial $5,000,000. This was done by wire transfer. BPB never actually paid $202,500,000 to Deutsche, and Deutsche never paid 197,500,000 to BPB.

40.     On September 25, 2001, BPB contributed its swaps position and the 7.6 million in Solution 6 stock for a 99% capital interest profit and a 90% profit interest in BM Investments. BM had been formed on September 24, 2001. Simultaneously, Montgomery transferred $64,862 plus 50,000 shares of Solution 6 stock to BM. For this, he received a one percent capital interest and a 10% profit interest in BM. According to the Government's expert, the transfer of the 7.6 million shares actually went from BFC to BM Investments.

41.     On October 1, 2001, Beal reduced his ownership interest in BPB Investments to 99% from 100% and admitted Beneficial Property which contributed approximately $90,000 into BPB.

42.     On December 17, 2001, Montgomery received a refund of his initial investment and also was paid a $150,000 "buyer premium."

43. At the same time as referenced above, $3.4 million of AUD or $1.735,499 USD equivalent was sold by BM Investments to Deutsche.

44. This sale triggered a Section 988 foreign currency loss which the Government's expert testified was actually a fiction. What was taken as a loss was actually a built up basis, $150 million loss in 2001, and a sale on January 18, 2002, which triggers a $50 million loss for that year.

45. Montgomery did not participate in any meaningful tax loss in that his partnership interest was redeemed one day before the Australian currency was sold.

46. The offsetting long and short swaps terminated on November 13 and 28, 2001, respectively.

47. The short swaps provided that, if the spot rate on the rate determination date was greater than or equal to the digital level which was defined as the Digital Event, then BPB would have to pay Deutsche the predetermined exchange amount.

48. The long swaps had a corresponding Digital Event which, if reached, would have required Deutsche to pay BPB the predetermined exchange amount.

49. The Government's Exhibits 60 and 61 are the long swaps, and the Government's Exhibits 62 and 63 are the short swaps.

50. Exhibits 60 and 61 are identical except as to the termination and exchange dates and digital levels. Exhibit 60 has a digital level of AUD .5525 per USD 1.00, while Exhibit 61 has a digital level of .5555 per USD 1.00.

51.     The long swaps (Exhibits 60 and 61) provide that BPB Investments LC pay a yield adjustment fee of $101,250,000 on 60 and the same amount on 61. The short swaps (Exhibits 62 and 63) provide for a yield adjustment fee paid by Deutsche of $98,750,000 for each swap. The net out-of-pocket yield adjustment fee paid by BPB was $5,000,000.

52.     The long swaps obligated BPB to pay an exchange amount of a certain percentage should the spot rate on the currency be greater than or equal to the digital level as determined in the swap. Unless the digital level occurred, no payment was due. Likewise, the short swaps required Deutsche to pay an exchange amount if the spot rate on the currency was greater than or equal to a pre-determined digital level.

53.     On Exhibit 60, the digital level was AUD .5525 per 1.00 USD. The corresponding short swap, Exhibit 62, established a digital level of AUD .5527 per 1.00 USD. This .0002 difference was referred to in trial as the "sweet spot." Testimony at trial also indicated that the chances of hitting the sweet spot were next to impossible. The difference in the corresponding long and short swaps, Exhibits 61 and 63, also had the same .0002 sweet spot.

54.     According to Plaintiffs' expert, disregarding the digital levels, the swaps provided for four payments of about 1.2 million Australian dollars. This promised payment, when deducted from the $5 million originally paid by BPB, nets the total out of pocket to BPB of $2.5 million USD. If the Australian exchange rate exceeded the

digital level, then BPB stood to gain an additional $2.5 million dollars on each respective swap. If the exchange rate hit the sweet spot, then the potential recovery was $2.2 billion. Again, all parties and experts agreed that this was next to impossible.

55. Using as an example the first called for rate determination date in Exhibit 60 and 62 (the offsetting swaps), the general idea of how the swaps worked is set forth below.

    a. The long swap (60) reflects Deutsche's obligation to pay BPB.

        i. If the Digital Event is less than AUD .5525 per 1.00 USD, then Deutsche has no obligation to pay BPB. Likewise, under the corresponding short swap (Ex. 62), BPB is not obligated to pay Deutsche, since perforce the digital level of AUD .5527 per 1.00 USD was not reached.

        ii. By referring to Exhibits 60 and 62, for the first exchange, if the Digital Event was greater than or equal to AUD .5527 per 1.00 USD, then BPB would receive a payment of over $2.5 million dollars. There were four chances at obtaining this result which could have netted BPB $10 million in the swaps "lottery." The likelihood of this happening, according to all the testimony, was unlikely and in fact did not happen.

        iii. By referring to Exhibits 60 and 62 for the first exchange, if the Digital

Event was .5525 to .5526, then under the terms of the swaps Deutsche would have to pay BPB on one exchange date the sum of $552,500,000. There were also four dates on which this could happen. According to all parties and experts, the maximum payout for all four dates was a staggering $2.2 billion dollars.

56.     BPB contributed the short and long swaps to BM Investments. This represented the $5 million dollars of cash originally contributed by Beal to BPB. In other words, the price of the swaps was $5 million. Montgomery contributed approximately $ 90,909 of cash and Solution 6 stock.

57.     On September 25, 2001, BPB also contributed all the Solution 6 stock it had acquired.

58.     Montgomery was primarily responsible for negotiating the swaps.

59.     On transfer of the swaps, BM Investments established a basis of $202,500,000 in the long swaps. BM Investments did not offset the basis in the long swaps with the short swaps since Montgomery believed that the shorts were to be disregarded for Section 752 analysis in that they were contingent obligations.

60.     Beal's K-1 from BPB indicated a contribution basis of $206,500,000.

61.     Transferring the swaps from BPB to Bemont only altered the identity of the beneficiary of the hedge. It did not alter the nature of the underlying foreign currency exposure or enhance the efficacy of the hedges.

62. Montgomery was aware of IRS Notice 2000-44 before the swaps were entered into with Deutsche.

63. Plaintiffs' expert, Chance, testified that the swaps were in fact hedges. If the Australian currency went up, then BPB could potentially receive $10 million, irrespective of the sweet spot.

64. Chance also testified that the swaps were in the nature of a loan as well as an option and hedge.

65. Chance testified that, by paying $2.5 million, BPB was buying the right to receive up to four additional payments of $2.5 million.

66. According to Chance, the value of the transaction using a Black Scholes model analysis was $2.2 million. Ignoring the sweet spot, Chance estimated that the value of the transaction was $550,000.

67. Using another analysis, Chance testified that the probability of profit was 6.75%. The probability of hitting the sweet spot was less than half a percent.

68. Chance admitted that Deutsche could probably manipulate the sweet spot so that it was not hit.

69. Even Montgomery testified that the chance of the hitting the sweet spot and hence a $2.2 billion payout under the four swaps was highly unlikely or remote.

70. Montgomery testified that this approximate $200 million loss was based on the accountant Coscia's opinion as to his interpretation of the Internal Revenue Code.

71.     Montgomery testified that the tax benefits from the swaps were definitely a part of the consideration for using the swaps.

72.     However, Beal could have used a number of other transactions to guard against the currency risk.

73.     Montgomery agreed that Deutsche would not have done the short swap without a corresponding long swap.

74.     The swaps were exchanged after the contracts expired.

75.     The swaps were off-market transactions.

76.     Beal could have gotten the same protection on the currency swaps by investing $600,000 if the "sweet spot" were disregarded.

77.     Early on, the Australian law firm Swaab told BFC that it could not assist in a takeover of Solution 6 and in fact was hired to advise BFC in response to an inquiry received regarding BFC's purchase of Solution 6 stock.  *See* SWAAB DEPOSITION at 17.

78.     Swaab also was asked whether the firm could assist with loan documentation in regard to BFC's funding of Chris Tyler's acquisition of Solution 6 shares.  *See* SWAAB DEPOSITION at 19.

79.     According to Swaab, less than $4,000 was billed for his services.

80.     On December 17, 2001, BPB redeemed Montgomery's interest in BM for 215,000 shares of Solution 6 and a cash buyout premium of USD $150,000.

81.  BM then "sold" 75% of the AUD generated from the swaps in BPB in 2001, claiming for tax purposes roughly $153 million in tax losses.  In 2002, BPB sold the balance of its AUD generated from the swaps, claiming a loss for tax purposes of roughly $46 million.

82.  In 2001, after claiming a $153.6 million deduction from the partnership on his personal income tax return, Beal reported income in the amount of $8.6 million, and paid $2.67 million in income taxes.

83.  In 2002, after claiming a $46.5 million deduction from BPB on his personal income tax return, Beal reported income in the amount of $74.6 million, and paid $27.8 million in income taxes.

84.  Bemont reported on its 2001 partnership tax return a Section 988 loss on foreign currency swaps in the amount of $2,505,579 – primarily from the net cost of the digital swaps.

85.  BPB's 2001 tax return Schedule K-1 for Beal reflects a capital contribution of $206,500,000, but Beal did not contribute this in cash; the only assets he purportedly contributed to BPB in 2001 were the Solution 6 shares and $5 million.  The $206,500,000 reported capital contribution on Beal's BPB Schedule K-1 represents the purported cost of the long swaps (at $202.5 million) without taking into account the funds received from Deutsche Bank for the short swaps, the Solution 6 shares, and some Australian currency.

86. Although BPB's 2001 partnership tax return reflects Australian currency of $46,990,651 (*see* Statement 4) held by BPB as of December 31, 2001, BPB did not have AUD $46,990,651 in a bank account. Instead, this is the purported basis that BPB inherited in the AUD $46,990,651 of Australian currency when Bemont was liquidated. When Bemont was liquidated, only AUD $4.8 million actual Australian currency went to BPB (via deemed distribution) from the fixed payouts Bemont received from Deutsche Bank under the swaps.

87. The 7.6 million shares of Solution 6 stock also reflected on Statement 4 of BPB's 2001 tax return for $4 million at the end of the year is the same $4 million of Solution 6 stock that BFC's board of directors authorized the purchase of, and which were ultimately distributed to Beal in September 2001 by BFC. The "Accounting" charge listed on Statement 1 of BPB's 2001 tax return is part of the cost of the Coscia Greilich Swaps tax opinion.

88. In 2005, the IRS audited Beal's individual Form 1040 tax return for the 2002 tax year for losses — including those from BPB — flowing through to his personal return. Stephen Pocsik was assigned the examination of Beal's 2002 tax return on April 27, 2005.

89. Pocsik specifically examined whether Beal had sufficient basis to absorb the losses, however, he was not furnished any information concerning the short swaps by Beth

Montgomery, Beal's personal accountant.

90. Although the IRS agent made no adjustments to Beal's basis in BPB, Pocsik did not have all the information concerning the swaps. Information related to the offsetting swaps was not disclosed. This information was deliberately withheld by Beth Montgomery.

91. On October 3, 2006, the IRS sent a Notice of Beginning of Administrative Proceeding to BPB.

92. On October 13, 2006, the IRS issued the FPAA to BM for the tax year ending December 19, 2001, and to BPB for the tax year 2002.

93. The BM FPAA addressed BM's tax year ending December 19, 2001. In the FPAA, the IRS disallowed the partnership losses at issue and imposed accuracy-related penalties at rates of 20% and 40%.

94. The BPB FPAA addressed BPB's tax year ending December 31, 2002. In the FPAA, the IRS disallowed the partnership losses at issue and imposed accuracy-related penalties at rates of 20% and 40%. Prior to filing suit, BM and BPB's members made the jurisdictional deposit of the tax as required by 26 U.S.C. § 6226(e)(1).

95. On January 9, 2007, BM and BPB filed the present partnership proceeding through their tax matters partner, pursuant to 28 U.S.C. § 1346 and 26 U.S.C. § 6226.

96. At the time the Complaints were filed, BM and BPB met the net-worth requirements of 26 U.S.C. § 7491 in that their net worth was less than $7 million.

97.     Montgomery testified that the tax benefit generated by the swaps was the step up in basis.

98.     Any tax losses were generated by the swaps and not by the decision to not pursue a Solution 6 tender offer.

99.     Montgomery testified that $200 million in basis resulted from the contribution of the long swaps from BPB to Bemont.

100.    Montgomery testified that the tender could never be finalized because he could not get Telstra to commit to selling their shares.

101.    Montgomery testified that any potential tender was called off by December 6, 2001. Montgomery testified that, by the end of October 2001, it looked less likely that any tender would take place.

102.    On September 13, 2001, Montgomery sent the Australian law firm a letter confirming that Beal did not anticipate a tender even though BFC was in the initial stages of exploring the possibilities. The swaps were entered into one day after the letter.

103.    Montgomery also testified that, from August 2001 forward, Telstra had been acquiring more companies for cash and this also soured any potential for a takeover.

The Court specifically cites to and relies upon the Fifth Circuit's holding in *Klamath Strategic Investment Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009) in finding that this transaction lacked economic substance as a matter of law. As noted by the Fifth Circuit, the economic substance doctrine allows courts to enforce the legislative purpose of the

Internal Revenue Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality. A transaction must be honored as legitimate for tax purposes if certain factors are present: (1) it has economic substance compelled by business or regulatory realities; (2) it is imbued with tax-independent considerations; and (3) it is not shaped totally by tax-avoidance features. *Klamath*, 568 F.3d at 543 (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84, 98 S. Ct. 1291, 1303-1304, 55 L. Ed.2d 550 (1978)). Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes.

In summary, the Court concludes that the proposed tender offer in this case was just a smokescreen for tax avoidance. The swap transactions provided no economic benefit to the purported tender offer and lacked economic substance for the following reasons:

a. Before the purchase of the swaps, BPB had made the determination not to actively pursue Solution 6.

b. Any concern with currency risk could have been undertaken in other ways which made more economic sense.

c. The structuring of the various entities was only done to accomplish tax objectives for a sheltered writeoff.

d. After September 13, 2001, the use of the swaps when considered alone had no real economic benefit to the transaction.

e. If BPB had pursued the tender offer, the swaps would have contributed only

marginal benefit.

f.   Although there was an original business plan to pursue Solution 6, this plan was abandoned at or near the time BPB entered into the swaps.

g.   The main business purpose in purchasing the swaps was to merely generate tax losses, thereby, offsetting other gains reported by Beal.

h.   Although Montgomery testified that BPB was willing to be exposed to as much as a 7% currency swing, but sought protection up to 12%, the real currency risk when translated into dollars was a small amount of the original investment amount BPB had been willing to invest.

i.   In 2001, Australian law did not require a particular form of hedging of currency risk or hedging at all with respect to a tender of Solution 6.

j.   Swaab did not recall any discussions with Montgomery regarding the funding requirements under Australian law for a potential takeover of Solution 6, whether a takeover bid would need to incorporate the specific funding arrangements, or whether a takeover bid should be made in Australian or American dollars.   Swaab also did not recall any discussions with Montgomery regarding whether it would be commercially reasonable to hedge the foreign currency risk associated with a takeover bid if American dollars were not immediately converted to Australian dollars.  *See* SWAAB DEPOSITION at 30.

k.  There were no contracts during the time period that the swaps were in existence that required payments in any AUD.

l.  During the relevant period, the partnerships paid no foreign taxes.

m.  No need for foreign currency hedging ever materialized for the partnerships before their termination.

n.  There was no attempt by Montgomery to independently verify the pricing of the swaps or the possible outcomes under the swaps with any person or entity independent of Deutsche.

o.  There was no effort to determine how the yield adjustment fee was calculated, nor was there any attempt to bargain for better rates or more favorable conditions.

p.  Although the parties initially intended to explore the possibilities of a tender offer, the window dressing afforded by the swaps became the primary and motivating factor for entering into the transactions with Deutsche.

q.  By the time the swaps were entered into with Deutsche, BPB had no real intent of pursuing any tender offer.  What was at first a legitimate attempt to secure a possible business was rendered illegitimate by the overriding desire to offset income with extraordinary high and artificial tax losses.

r.  The focus of the parties after mid-August to September 1, 2001 was on the tax treatment of the swaps, while ignoring all other aspects of the foreign

currency investment and demonstrates that the real purpose of the swaps was tax avoidance.

s.    Use of the Black-Scholes pricing model by all experts points to the fact that the options were overpriced and thus did not reflect reasonable market prices or rational economic behavior.

t.    There was no reasonable expectation of profit from the transaction.

Furthermore, adopting the reasoning of the Fifth Circuit in *Kornman & Associates, Inc v. U.S.*, 527 F.3d 443 (5th Cir. 2008), the Court finds that, for Section 762 analysis, the short swaps were partnership liabilities and should have been accounted for by the partnerships in offsetting the basis generated by the long swaps. The obligation by Deutsche to pay BPB was known and fixed by the transaction date. The only "contingency" (and a remote one at that) was what BPB might receive from Deutsche should the currency hit certain levels. The contingency, at best, was marginal and had little impact on the economics of the transaction. Setting aside the unrealistic probability of hitting the "sweet spot," under BPP's reasoning, a return of $10 million on a $2.5 million cash outlay would still have generated losses for BPB in excess of $190 million. Tax losses such as this which do not correspond to actual economic losses are not bona fide deductible losses. TREAS. REG. § 1.165-1(b). Further, the failure of the partnership to treat the short swaps as liabilities "flies in the face of reality." *Kornman*, 527 F.3d at 461.

Plaintiffs also have sought a declaration from the Court that Treasury Regulation 1.752-6 was retroactively applied and thus unconstitutional. Plaintiffs argue that the statute does not fulfill any statutory exception to the general prohibition against retroactive regulations and because it is not entitled to any deference because it does not carry out Congressional intent in a reasonable manner as required by *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984). The regulation at issue defines liability to include any fixed or contingent obligation. Plaintiffs cry foul and note that this definition applied retroactively flies in the face of the IRS's position over the previous three decades.

The Court need not address whether Treasury Regulation 1.752-6 is unconstitutional in that the Court has found that the transaction lacked real economic substance. The Court notes that there is a divergence of authority in this area but because the transaction is devoid of economic substance, the Court need go no further in its analysis. *See Cemco Investors, LLC v. United States,* 515 F .3d 749, 752 (7th Cir. 2008) (regulation can be applied retroactively); *Murfam Farms, LLC v. United States,* 88 Fed. Cl. 516 (2009) (regulation cannot be applied retroactively); *Maguire Partners-Master Invs., LLC v. United States,* 2009 WL 4907033, 103 A.F.T.R. 2d 763, 776-778 (C.D. Cal. 2009) (regulation can be applied retroactively); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 667-671 (regulation cannot be applied retroactively) (2008); *Sala v. United States,* 552 F. Supp.2d 1167 (D. Colo. 2008) (regulation unlawful and cannot be applied retroactively); *Klamath Strategic Inv. Fund, LLC v. United States,* 440 F. Supp.2d 608, 625-626 (E.D. Tex. 2006) (retroactivity of

regulation is ineffective).

In any event, the linchpin of Plaintiffs' arguments arises from a technical anomaly in the tax code under a line of cases interpreting Section 752, *i.e.*, that a purchased option is an asset, but a sold option is only a contingent liability. Thus, Plaintiffs have taken the position that they can purchase offsetting swaps, hedges, or options and contribute them to a partnership entity and thereby contribute an asset but not a liability. Thereafter, under Plaintiffs' theory, the asset is used to inflate the basis of the partner's interest in the entity.

Irrespective of the technical arguments mustered by Plaintiffs, the Court finds that it would be absurd to consider these offsetting swaps as separate items. If no offset were in place, one party or the other might end up in bankruptcy. No sane or reasonable business person would enter into one transaction without providing some stop gap measure to avoid financial catastrophe. Plaintiffs' Motion for Partial Summary Judgment Regarding the Invalidity of Treas. Reg. § 1.752-6 (Dkt. 138) is therefore DENIED.

### Notice 2000-44

The Court must also determine whether the swaps at issue in this case were the type of transactions defined in Notice 2000-44. If not, then the statute of limitations has run as to the 2001 return. The Notice 2000-44 describes two general transactions which are deemed to use tax avoidance measures to artificially inflate the taxpayer's basis.

The first variation described involves a taxpayer borrowing at a premium and the partnership's subsequent assumption of the indebtedness. In the example given, the taxpayer

receives $3,000 from a lender under a loan agreement that provides for an inflated interest rate with a stated principal of $2,000. When the taxpayer sells his interest in the partnership, only the $2000 is considered a liability which reduces the taxpayer's basis in the partnership. In this example, the partnership interest is $1,000 which represents the excess of the amount contributed over the stated principal amount of $2,000. The taxpayer then claims a tax loss with respect to the basis amount even though the taxpayer has incurred no corresponding economic loss.

The second variation discussed involves the purchase of options. In the Notice example, a taxpayer might purchase call options for a cost of $1000x and simultaneously write offsetting call options with a slightly higher strike price but the same expiration date for a premium of slightly less than $1000x. The option positions are then transferred to a partnership. The basis in the interest is then increased by the cost of the purchased call options but not reduced under Section 752. On the disposition of the partnership interest, the taxpayer claims a loss of $1000x even though the taxpayer has incurred no corresponding economic loss.

The question is whether the instant transaction is a similar arrangement designed to produce non-economic tax losses by artificially overstating basis in partnership interests. Plaintiffs' expert testified that the swap transactions were not substantially similar since Beal had actually incurred an economic loss of $2.5 million. He further testified that, based on his understanding of the transaction, the primary objective of Beal's partnerships was to take over Solution 6. Similar option shelters in foreign currency have been held to be substantially similar to the transactions delineated in Notice 2000-44. *See Cemco Investors,* 515 F.3d at 749.

The Court finds that the swap transaction was substantially similar to those transactions noted in Notice 2000-44. The notice also covers those transactions lacking in any real economic substance Here, the tax losses claimed do not correspond to any actual economic losses; nor do they constitute the type of "bona fide" losses that are allowable deductions under the IRS Code and regulations; and, in any event, they are not actual and real.

## PENALTIES

The Court has already ruled that the Government may not assert a substantial valuation penalty (*see* Dkt. 221). The question is whether the Government can assert a penalty for negligence. As to that issue, the Court makes the following findings and conclusions:

104.    Montgomery testified that he sought tax advice on the effect of the swaps from Matt Coscia, who had previously worked with Montgomery.

105.    Montgomery first sought Coscia's assistance on the tax treatment in late August or early September, about two weeks before the actual purchase of the swaps.

106.    Montgomery stated that Beal reviewed Coscia's opinion before the partnerships filed their returns.

107.    Montgomery testified that Coscia's opinion was that the swaps were not Notice 2000-44 transactions. Montgomery asked Coscia to revisit his opinion sometime in August 2002.

108.    At the time the returns for the partnerships were filed, Montgomery thought it was highly likely that the returns would be audited.

109. The partnerships were aware that Notice 2000-44 might apply to the instant transactions.

110. The partnerships sought advice not only from Coscia but also from a law firm as to the propriety of the transactions. The law firm's opinion was not offered into evidence at trial.

111. No evidence was submitted by Plaintiffs as to any advice received from anyone other than Coscia.

112. The Court finds that Coscia was not truly an independent advisor to the partnerships, but that his close association with Montgomery weighs against him rendering unbiased advice. Coscia advised on a number of partnership transactions involving questionable deductions. He was paid well for his services – $150,000 for this one opinion.

113. Coscia did little independent research into the question as to whether the investment vehicle would pass the IRS "sniff test." Much of his "work" was cut and paste from prior opinions used by other tax shelter advocates.

114. In other words, Coscia gave Montgomery want he wanted – an opinion that passed on the investment strategy.

115. The Court finds that neither Montgomery nor Coscia were credible in their testimony as to the real purpose behind the foreign currency swaps.

The Government imposed a 20% penalty for negligence or disregard of rules and regulations under Section 6662(b)(1). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. 26 U.S.C. § 6662(c); TREAS. REG. § 1.6662-3(b)(I). It also includes the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Heasley v. Commissioner of Internal Revenue,* 902 F.2d 380, 383 (5th Cir. 1990). Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which would seem "too good to be true" to a reasonable and prudent person. TREAS. REG. § 1.6662-3(b)( *l* )(ii).

There can be no finding of negligence if there was a reasonable basis for a return position. TREAS. REG. § 1.6662-3(b)(l). Reasonable basis is a significantly higher standard than not frivolous or not patently improper; it cannot be a merely arguable or colorable claim. TREAS. REG. § 1.6662-3(b)(3). Reasonable basis requires reliance on legal authorities and not on opinions rendered by tax professionals. *Id.*; TREAS. REG. § 1.6662-4(d)(3)(iii). The Court may, however, examine the authorities relied upon in a tax opinion to determine if a reasonable basis exists. TREAS. REG. § 1.6662-4(d)(3)(iii). The "reasonable basis" standard for reliance on opinions is lower than the "substantial authority" standard. TREAS. REG. § 1.6662-4(d) (2).

If a taxpayer acts in good faith and with reasonable cause in the calculation of taxes, penalties may not be applied. "No penalty shall be imposed under Section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that

the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1).

Here, the conduct of Montgomery and Beal forms the basis of the partnership's reasonable cause defense. The TEFRA structure enacted by Congress does not permit a partner to raise an individual defense during a partnership-level proceeding, but when considering the determination of penalties at the partnership level, the Court may consider the defenses of the partnership. *Klamath,* 568 F.3d at 548 (citing *New Millennium Trading, LLC v. Comm'r,* 131 T. C. No. 18, 2008 WL 5330940 at * 7 (2008)). Reasonable cause and good faith may be considered by a district court if asserted on behalf of the partnership. *Id.; see also Stobie Creek Invs., LLC v. United States,* 82 Fed. Cl. 636, 703 (2008). *But see Clearmeadow Invs., LLC v. United States,* 87 Fed. Cl. 509, 521-22 (2009) (finding *Klamath* and *Stobie Creek* "are in error" because the reasonable cause defense in Section 6444(c)(1) is unavailable at the partnership level). The *Clearmeadow* decision cites Treasury Regulation § 301.6221-1(d) and Temporary Treasury Regulation § 301.6221-1T(c)-(d) to contend that these defenses may not be considered at the partnership level. *Clearmeadow Invs.,* 87 Fed. Cl. at 520-21. Taking due notice of the conflicting opinions in the Court of Federal Claims, the Court is bound by the Fifth Circuit's decision in *Klamath,* which explicitly found that a district court has jurisdiction to consider the reasonable cause and good faith defense at the partnership level in a TEFRA proceeding. *Klamath,* 568 F.3d at 547-48.

The plaintiff bears the burden of proof on a reasonable cause defense. *Id.* at 548 (citing *Montgomery v. Comm'r,* 127 T. C. 43, 66, 2006 WL 2472807 (2006)). But, even if the Government bears the burden of proof, as argued by Plaintiffs, the resulting analysis is the same. The most

important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances. TREAS. REG. § 1.6664-4(b). "Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Klamath,* 568 F.3d at 48 (quoting *Swayze v. United States,* 785 F.2d 715, 719 (9th Cir. 1986)).

The Fifth Circuit in *Klamath* noted the district court's findings that the managing partners sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions and hired attorneys to write a detailed tax opinion, providing the attorneys with access to all relevant transactional documents. *Id.* (affirming district court's conclusion that no penalties should apply). The *Klamath* opinion noted that the trial court found that the partnerships proved by a preponderance of the evidence that they relied in good faith on the advice of qualified accountants and tax lawyers. *Id.*

Here, the only professional advice was from Coscia. Although the partnerships sought advice from tax lawyers, no evidence was presented as to the advice. The partnerships raised the defense of privilege and never shared that opinion with the Government. Had the opinion backed the partnerships' position and been introduced at trial, the Court would be inclined to follow the well-reasoned approach followed by the district court in regard to the Southgate matter. Yet, for some reason, Plaintiffs chose to rest their defenses on the shoulders of Coscia. The Court believes that Coscia was no more than a "puppet" for Plaintiffs and rendered no real independent or objective advice. Coscia said what he was paid to say. The Court, therefore, holds that the reasonable cause

defense and defense to negligence are not available to Plaintiffs here.

Having thus far ruled that the shelters lacked economic substance and no negligence or reasonable cause defenses are available and notwithstanding its finding that this transaction was substantially similar to the Notice 2000-44 letter, the Court still must examine – at least as to the 2001 tax year – whether limitations has run. As set forth below, the Court finds it has.

Prior to October 13, 2005, the IRS promoter team had received information from Deutsche Bank that identified BPB as an entity participating in foreign currency swaps. This information was furnished as part of the Government's investigation of Son of Boss transactions by a subpoena issued on Deutsche.

Plaintiffs have strongly argued and believed that there was an informant who alerted the IRS to the shelters. This argument has only been reinforced by the Government's steady and stubborn refusal to answer discovery on the issue, frequently ignoring this Court's orders to answer the question directly. After much frustration on not only on Plaintiffs' part but also this Court's, the Court is satisfied that there was no whistle blower but that Beal's name came up in the investigation of another unrelated shelter he was involved in prior to BPB. There was no informant here. Nonetheless, the Court is also satisfied that, well within three years after filing the returns, the Government had in its possession information identifying BPB and Bemont furnished by Deutsche.

As a general rule, the amount of any tax imposed must be assessed within three years after the return was filed. 26 U.S.C. § 6501. The Government relies on the exception outlined in 26

U.S.C. § 6501(c)(10) which provides a one-year extension from the earlier date of (A) the date on which the Secretary is furnished information with respect to a listed transaction as defined in 26 U.S.C. § 6707(c)(2) or (B) the date a material advisor meets the requirements of Section 6112 with respect to the Secretary's request under that statute relating to the listed transaction with respect to such taxpayer. 26 U.S.C. § 6501(c)(10).

The Court finds that subpart (A) is not applicable. Ms. Montgomery never furnished information as to the short swaps in the audit; thus, the IRS did not have all information available to it.

This leaves the question of whether the requirement of subpart (B) was met. According to the evidence in this case, Deutsche furnished information to the IRS prior to the summer of 2005 which identified BPB and Bemont as engaging in the swap transactions. *See* Plaintiffs' Exhibits 108 & 117a. The actual summons were not admitted. Curiously, one of the IRS agents, Don Berkowitz, who examined these transactions testified that the swap transactions were not substantially similar to Notice 2000-44 transactions. Plaintiffs' Exhibit 104 reveals that the IRS at first chose to ignore swap transactions in its summons requests. What is clear is that, by July 2005, the IRS had information which identified BPB and Bemont, and, as to Bemont or BM Investments, the account number for buy and sell, the foreign exchange amount, the foreign exchange rate, the USD involved, the trade and sell dates, and the percentage sold. The IRS, however, claims that this information did not meet the requirements of information to be provided as a "listed transaction." A threshold question is whether the statute which the IRS cites applies to this case.

30

On October 22, 2004, Congress enacted the American Jobs Creation Act of 2004 (AJCA), Pub. L. 108-357, sec. 814(a), 118 Stat. 1581, which added Section 6501(c)(10) to the Code. Section 6501(c)(10) provides:

> Listed transactions – If a taxpayer fails to include on any return or statement for any taxable year any information with respect to a listed transaction (as defined in Section 6707A(c)(2)) which is required under Section 6011 to be included with such return or statement, the time for assessment of any tax imposed by this title with respect to such transaction shall not expire before the date which is 1 year after the earlier of:
>
> > A.    the date on which the Secretary is furnished the information so required, or
> >
> > B.    the date that a material advisor meets the requirements of Section 6112 with respect to a request by the Secretary under Section 6112(b) relating to such transaction with respect to such taxpayer.

26 U.S.C. § 6501(c)(10).

Section 6501(c)(10) incorporates by cross-reference the definition of "listed transaction" set forth in Section 6707A(c)(2), which was added to the Code by AJCA sec. 811, 118 Stat. 1575. Section 6707A(c) provides the following definitions:

> (1)    Reportable transaction. – The term "reportable transaction" means any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under Section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion.
>
> (2)    Listed transaction. – The term "listed transaction" means a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of Section 6011.

26 U.S.C. § 6707A(c).

The "cardinal principle" of statutory construction requires the courts "to give effect, if possible, to every clause and word of a statute." *United States v. Menasche,* 348 U.S. 528, 538-539, 75 S. Ct. 513, 99 L. Ed. 615 (1955) (internal quotation marks omitted). In applying the traditional rules of statutory construction, the Court assumes that Congress uses language in a consistent manner, unless otherwise indicated. *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 235-236, 75 S. Ct. 733, 99 L. Ed. 1024 (1955). The various sections of the Code should be construed so that one section will explain and support and not defeat or destroy another section. *Crane v. Commissioner,* 331 U.S. 1, 13, 67 S. Ct. 1047, 91 L. Ed. 1301 (1947). Furthermore, "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *E.I. du Pont de Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S. Ct. 364, 68 L. Ed. 788 (1924).

AJCA sec. 814(b), 118 Stat. 1581, provides that 26 U.S.C. § 6501(c)(10) is effective for tax years "with respect to which the period for assessing a deficiency did not expire before" October 22, 2004. On October 22, 2004, the period for assessing a deficiency with respect to Bemont's 2001 tax year was open under 26 U.S.C. § 6501(a). Therefore, if the Court regards as determinative the effective date provided in AJCA Sec. 814(b), Section 6501(c)(10) is effective for Bemont's 2001 tax year. Section 6707A, which imposes a penalty for failure to include on a return or statement any required information with respect to reportable transactions and listed transactions, is effective for returns and statements the due date for which is after October 22, 2004, and which were not filed

before that date.  AJCA sec. 811(c), 118 Stat. 1577.

Does this create a conflict in statutory interpretation?  The Court finds that it does not.
Section 6707A does not alter the definition of reportable or listed transaction.  The regulations under
Section 6011 which define listed transaction were published in regulatory form prior to Bemont
engaging in the currency swaps.  Any interpretation that Sections 6707A and 6510(c)(10) are
internally inconsistent would violate the cardinal rule of statutory construction.  One statute provides
for a penalty for non-compliant returns after an effective date, while the other statute provides for
an extension of limitations if the return has not been filed by the Act's effective date.

Not only were Plaintiffs on notice as to the possible application of Notice 2000-44 to the
transaction, they were also on notice of the IRS regulations enacted shortly before the returns were
filed.  On June 14, 2002, the IRS issued temporary and proposed regulations, including Temporary
Treasury Regulation § 1.6011-4T that imposed new reporting and registration requirements for
certain listed tax shelter transactions.  Among other things, the regulations extended certain reporting
requirements to partnerships and individuals.  The new regulations required that an individual
taxpayer who participated, directly or indirectly, in a "reportable transaction" that was a "listed
transaction" as defined had to file a disclosure statement with his or her tax return.  TEMP. TREAS.
REG. § 1.6011-4T(a)(1).  A "listed transaction" was any transaction that was the same as or
"substantially similar" to a transaction that the IRS had determined to be a tax avoidance transaction,
such as that set forth in IRS Notice 2000-44.  *Id.* at § 1.6011-4T(b).  A transaction would be treated
as being the same or "substantially similar" to such a transaction if the transaction was expected to

obtain the "same or similar" tax benefits and was either factually similar to such a transaction or based on the same or a similar tax strategy. *Id.* at § 1.6011-4T(b)(1)(I). The term "substantially similar" was to be construed broadly in favor of disclosure. *Id.* The preamble to the revised regulations stated that the IRS planned to issue future regulations extending the disclosure requirement to other transactions, not simply "listed" transactions. TEMP. TREAS. REG. § 1.6011-4T. Therefore, the Court finds that 26 U.S.C. § 6510(c)(10) extended the assessment period.

The only remaining question is whether the information furnished by Deutsche satisfies the statute. If so, the IRS was on notice more than one year prior to the FAPA and thus is barred from pursuing Plaintiffs for the 2001 tax year.

The IRS has steadfastly maintained that the disclosure required of Deutsche as a material adviser did not meet the requirements listed in 26 C.F.R. § 301.6112-1(b)(3)(i)-(iii). The parties agree that 26 C.F.R. § 301.6112-1T, the temporary treasury regulation which was current at the time of the swaps, controls the disposition of the limitations issue as related to the requirement to maintain a list. A copy of the temporary regulation submitted by the parties is attached hereto as Exhibit A.

Under the temporary regulation, organizers or sellers of potentially abusive tax sellers must maintain a list identifying certain persons who acquire interests in the tax shelter. *See* 26 C.F.R. § 301.6112-1T at A-1. Are the swaps potentially abusive tax shelters? Under A-4, the answer is "yes" if the transaction's significant purpose is the avoidance or evasion of federal income tax. *Id.* at A-4.

Neither party argues that Deutsche is not either a seller or organizer. So, the remaining question is was Deutsche required to maintain a list? The resolution of this question has been an evolving one, and even the parties have demonstrated frequent confusion as to what regulations apply and in what time period. Much of the effort in piecing together this patchwork of laws, notices, and regulations is akin to a dog chasing its tail. However, the regulation at issue defines "an interest" in a tax shelter. *Id.* at A-7. The Court believes that Bemont's purchase of digital options is not a right to participate in a tax shelter. Its "right to participate" is not tied to any partner or corporate interest nor tied to any interest in property. The swaps are not in and of themselves abusive tax shelters. The way the swaps were treated for tax purposes is the abuse.

However, Plaintiffs do not challenge the IRS's position that Deutsche was required to maintain a list. Assuming Deutsche was required to maintain a list, it was required to maintain the list to enable the IRS to determine without undue delay or difficulty the information required by A-17 of the temporary regulation, which lists 11 different components required for any list.

A-17. (a) A list must contain the following information –

(1) The name of the tax shelter and the registration number, if any, obtained under section 6111;

(2) The TIN (as defined in section 7701(a)(41)), if any, of the tax shelter;

(3) The name, address, and TIN (as defined in section 7701(a)(41))) of each person who is required to be included on the list under A-8 or A-10 of this section and , in the case of a tax shelter that is a transaction described in section 6111(d)(1)(A) and § 301.6111-2T(b) whether or not the direct or indicted participant is a corporation, the name, address, and TIN of each investor and any indirect corporate participant in the shelter if known to the organizer or seller;

(4) If applicable, the number of units (i.e., percentage of profits, number of shares, etc.) acquired by each person who is required to be included on the list;

(5) The date on which each interest was acquired;

(6) The amount of money invested in the tax shelter by each person required to be included on the list under A-8 or A-10 of this section;

(7) A detailed description of the tax shelter that describes both the structure of the tax shleter and the intended tax benefits for participants in the tax shelter;

(8) A summary or schedule of the tax benefits that each person is intended or expected to derive from participation in the tax shelter, if known by the organizer or seller;

(9) Copies of any additional written materials, including tax analysis or opinions, relating to the tax shelter that have been given to any potential participants in the tax shelter or to any representatives, tax advisors, or agents of such potential participants by the organizer or seller or by any other person who has participated in the offering of the tax shelter (excluding any written materials that the organizer or seller has never possessed);

(10) If the interest was not acquired from the person maintaining the list, the name of the person from whom the interest was acquired; and

(11) The names and address of each agent of the person maintaining the list who is described in paragraph (b) of A-6 of this section.

26 C.F.R. § 301.6112-1T at A-17(a).

As to Requirement (1) requiring the name of the tax shelter and registration number if any,

Deutsche furnished the IRS documents entitled Son of Boss Transactions pursuant to a subpoena.

No registration number was required for the "shelter." Thus, Requirement (1) is met. Requirement

(2) requires the TIN, if any. Again, there was no TIN and none was required. Requirement (3) calls

for the name, address, and TIN, if known. Again, there is no showing that the Bemont's TIN was

known to Deutsche. However, a name and partial address for the partnerships at issue appear. Requirement (4) is not applicable. Requirement (5) is met in substance by a notation of the date as reflected on the relevant exhibits. The fact that the exhibits reflect a date of 3 months after the transactions were entered into substantially complies. The IRS cannot argue that the date somehow misled it. Requirement (6) is met by the notation of the investment.

As to the remaining Requirements (7) - (11), there is no showing that Deutsche knew anything about how Bemont wanted to structure the transaction. There was no showing that Deutsche had possession of any tax opinions from the multitude of firms providing opinions on the legality of various transactions. Requirements (10) and (11) are simply not applicable. So, as indicated, the Court finds that Deutsche substantially complied with the applicable regulations as set forth in 26 C.F.R. § 301.6112-1T, A-17. The IRS could have used the information available to it to pursue what was given to it as Son of Boss transactions.

In fact, its own corporate representative admitted as much. The deposition of Don Berkowitz indicates that the IRS at first did not seek information regarding swaps. *See* BERKOWITZ DEPOSITION at 18. In fact, as previously noted, he did not believe they were substantially similar. *Id*. Berkowitz testified that the original materials received from Deutsche's counsel were not computerized. Berkowitz testified that the IRS had documents prior to 2007 which referenced BPB but didn't know if those documents would be considered a list. *Id*. at 27.

Q: "Prior to 2007, did Deutsche Bank produce a list to the Internal Revenue Service naming BPB Investments LC, they type of transaction, a swap, and the ODET numbers to the Internal Revenue Service–Odet reference numbers to the Internal

Revenue Service"?

A: "I know we had information–documents with that kind of information on it, but I don't know if you would consider that a list." *Id*. at 29.

Berkowitz testified that Plaintiffs' Exhibit 108 was received by the IRS in response to part of a 6707 or 6708 examination. *Id*. at 30. He also testified that Plaintiffs' Exhibit 108 was received in July 2005. *Id*.

The IRS has maintained that, until they developed a computer program to search the material furnished, there were just too many documents to search. This did not occur until 2007.[1] No one has ever produced the subpoena issued in 2004, but clearly the letter received from New York counsel states that the documents are responsive to a request for Son of Boss transactions, and there is no dispute that BPB is mentioned. *See generally* Plaintiffs' Exhibit 2100. In any event, the information provided satisfied A-16 of the temporary regulation, *i.e.*, a list from which the IRS could determine without undue delay or difficulty any information it required.

The Court concludes that, assuming Deutsche was required to maintain a list (since both parties appear to agree that it was), the information furnished substantially complied and that limitations has run on the 2001 return. The IRS simply failed to act on and ignored the very information it sought.

The IRS has frequently argued that just because it had a name that does not mean it could locate the entity. Although no party has raised this issue, the audit file on Beal which was completed

---

[1] Yet the IRS had enough information to issue the FAPA well before it had the list it received in 2007.

in the summer of 2005 contains the address for BPB. In fact, Plaintiffs' Exhibit 2109 notes that the audit file on BPB was run on April 28,2005, identifying BPB. It appears that, on April 28, 2005, Pocsik pulled the IDRS on BPB. The file also contains the employer i.d. numbers for the partnerships and the TIN for BPB. For the IRS to claim that they could not use the information provided by Deutsche is patently wrong.

Plaintiffs have also requested that the Court deem certain matters against the IRS. Plaintiffs re-urge their Motion to Deem Facts under Fed. R. Civ. P. 37. What Plaintiffs seek is an order sanctioning the Government for discovery abuse.

On April 14, 2010, the Court found that, pursuant to the IRS summons, information on Bemont and BPB was provided to the IRS prior to October 2005. Both partnerships were identified pursuant to the IRS summons requesting information on Son of Boss transactions. The evidence at trial only substantiates this finding. Of course, the Government takes the position that this finding does not mean that the list requirements were met at that time. Simply stated, if the Bemont transaction was a Son of Boss transaction and the Government received information contemplated by 26 U.S.C. § 6501(c)(10), then limitations as to Bemont has run.

As Plaintiffs point out, there have been eight discovery motions involving the Government as well as three discovery hearings. As noted previously, the Court has been under the distinct impression that the Government was not candid and consistently relied on hyper-technical positions in order to not cooperate in discovery. Although the Government had information relating to documents produced by Deutsche, no documents in the Government's possession were ever

produced to Plaintiffs despite their requests.

This Court's scheduling order specifically contemplated that the IRS would produce documents relevant to the defense of limitations. Two requests for production directed to the IRS on this issue failed to turn up information which Plaintiffs' counsel subsequently received from Deutsche. Two 30(b)(6) witnesses also could not testify as to 2005 materials. Evidently, the relevant documents were obtained by another office within the IRS.

As the Court remembers the testimony presented at trial, Plaintiffs obtained the documents from Deutsche. Despite this, the Government objected to the introduction of documents which it had clearly received but never produced. In at least two hearings, the Government's counsel represented to the Court that the Government had not received information prior to 2007 which identified any of Plaintiffs' participation in swap transactions.

The IRS has rules, but so does the Court. After much discussion during a May 28, 2008 hearing, the Court asked prior Government counsel Jacobus whether the IRS had any lists as to Plaintiffs dealing with currency swaps prior to the lists received from Deutsche and verified under the penalties of perjury by the IRS affiant. Jacobus stated that he was not aware of any. *See* Dkt. 79 at 78-79. Jacobus went on to state that he went to the IRS and told the IRS what to look for. He stated that he made it very clear to the IRS that, if any list identifying one of Plaintiffs' counsel's clients was produced before 2007, he would have to know that information. Jacobus further went on and stated had such information turned up, the Government would have likely conceded the statute of limitations. "We would have just walked away and said looks like the statute ran. Well,

no such information turned up." *Id.* at 79.

The Court relied on this representation in ordering Plaintiffs' counsel to go issue a subpoena. In effect, regrettable knowing what the Court has learned from this case, the Court was requiring Plaintiffs' counsel to do what the IRS should have done long ago in the proceedings. The Court was simply misled by the Government's hyper-technical position. This is not to say that Jacobus didn't make a good faith effort, but only to say that the IRS was running the show, not the lawyers.

Exit Jacobus and enter new counsel for the Government, Adams. Again at hearing in September 2009, the Government, through its attorney Adams, represented that the only lists as Plaintiffs were those submitted in 2007 by Deutsche. *See* Dkt. 135 at 21. Two affidavits were filed with the Court confirming this position.

Throughout this process, the IRS has tried to inform the Court as to the rules that should apply from its perspective. Frequently, the Government has asserted claims of privilege as to information related to the taxpayers which do not make sense. The Court notes that for the purposes of Rule 37, an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose. *See* FED. R. CIV. P. 37. The Court finds that, not only has the Government submitted evasive answers to legitimate discovery, it has failed to produce information which was within its control, *i.e.*, the information from Deutsche received in 2005. This caused Plaintiffs to incur additional expense and time to find out what the Government knew about all along. Had the information been timely produced by the Government, maybe, as Mr. Jacobus stated, the limitation issue as to 2001 would have been resolved. At least Plaintiffs would have been able to do some

meaningful discovery from someone at the IRS who had some clue as to what was going on.

After conducting a post-trial hearing on Plaintiffs' Re-Urged Motion to Deem Facts Established Under Federal R. Civ. P. 37 (Dkt. 260), however, the Court believes that its finding that the statute has run renders Plaintiffs' request for sanctions MOOT. This is not to say that the Court condones conduct of Government's counsel and its client in this matter. The Court specifically finds that the Government was not candid with the Court or opposing counsel.

There was a list provided to the IRS in May 2005 which forecloses an assessment for the 2001 tax year. This list sufficiently identified Plaintiffs for purposes of 26 U.S.C. § 6501(c)(10), but the IRS waited almost two years before it requested a another list. This was improper. Further, based on all the evidence in this case, the Court concludes that the IRS had notice of BPB and BM's participation in the digital options early on but decided not to pursue these transactions because there were other shelters which it wanted to pursue first. Relying on what it felt was an interminable extension of the statute, the IRS waited for some period of time before looking at the digital options which had been produced in 2005 pursuant to its authority to require Deutsche to maintain a list regarding potentially abusive tax shelters. It simply did not act, and the game clock ran down.

IT IS THEREFORE ORDERED that the Government have judgment on all issues except as to the 2001 tax year for Bemont which the Court decides in the favor of Plaintiffs for the reasons stated herein.

**SO ORDERED.**

**SIGNED this 2nd day of August, 2010.**

42

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE